# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JACOB DARRELL TYRE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 21-CV-0150-GKF-CDL |
| | ) | |
| DAVID ROGERS, Warden,[1] | ) | |
| | ) | |
| Respondent. | ) | |

## OPINION AND ORDER

Petitioner Jacob Darrell Tyre seeks federal habeas relief on the ground that he is in state custody in violation of federal law pursuant to the criminal judgment entered against him in Tulsa County District Court Case No. CF-2015-4200. He claims he was deprived of his Sixth Amendment right to counsel because trial counsel conceded his guilt at trial without his permission. He further claims he was deprived of his Fourteenth Amendment right to due process because the prosecutor made improper remarks during closing argument and the trial court admitted improper opinion testimony of an expert witness. Having considered Tyre's Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus (Dkt. 1), Respondent's Response in Opposition to the Petition (Dkt. 7), Tyre's Reply (Dkt. 14), the record of state court proceedings (Dkts. 7, 8, 9), and applicable law, the Court finds and concludes that this matter can be resolved without an evidentiary hearing and that the Petition shall be denied.

---

[1] Tyre presently is incarcerated at the Joseph Harp Correctional Center (JHCC), in Lexington, Oklahoma. The Court therefore substitutes the JHCC's warden, David Rogers, in place of Scott Crow as party respondent. *See* Rule 2(a), *Rules Governing Section 2254 Cases in the United States District Courts*. The Clerk of Court shall note on the record this substitution.

## *BACKGROUND*

Tyre's daughter, P.T., was two days shy of turning three months old when Tyre called P.T.'s mother, Shyanne Warder, to report that P.T. "was a bit fussy" and had been crying but was not running a fever.  Dkt. 8-3, Tr. Trial vol. 2, at 76-86 [257-67].[2]  A few hours later, Tyre called Warder a second time to report that P.T. was not breathing.  *Id.* at 87 [268].  Warder promptly returned home from work and saw P.T. lying on the couch struggling to breath, "seizing[,] and unconscious."  *Id.* at 87-90 [268-71], 95 [276].  Tyre was standing by the couch, and Warder overheard from Tyre's phone call to 911 that an ambulance was fifteen minutes away.  *Id.* at 87-90 [268-71], 95-97 [276-78].  Warder decided not to wait for the ambulance, and Tyre drove Warder, Warder's father, and P.T. to the OSU Medical Center near their home.  *Id.* at 97-98 [278-79], 135-36 [316-17].  Emergency room personnel performed a CT scan, told Warder that P.T. had bleeding in her brain, and stabilized P.T. for transport by ambulance to the Children's Hospital at Saint Francis.  *Id.* at 99-102 [280-83].  Medical professionals at the Children's Hospital suspected child abuse and contacted the Department of Human Services and the Tulsa County Sheriff's Office.  *Id.* at 215-18 [396-99].

Later that night, Detective Greg Brown interviewed Tyre.  *Id.* at 234-36 [415-17], 245-52 [426-33].  Tyre ultimately told Brown that he was caring for P.T. while Warder was at work, that he became frustrated when P.T. would not stop crying, and that he "shook" P.T.  *Id.* at 261-62 [442-43]; Dkt. 9 (State's Ex. 9, audio recording of Tyre interview).  In a signed, written statement, Tyre described his actions as follows:

Shyanne leaves for work at 8 am and i slept in while [P.T.] was sleeping.  [P.T.]

---

[2] For consistency, the Court's citations refer to the CM/ECF header pagination.  However, when citing to transcripts of state court proceedings, the Court also includes the original page numbers from the transcript, in brackets, if those page numbers differ from the CM/ECF pagination.

wakes up about 10:30 am I changed her diaper and made her a bottle but the time she got up she was screaming. I was trying to calm her down and get her to eat but she wouldn't I was getting frustrated so i picked her up firmly and I raised my voice saying "Why do you have to do this with me" and I shook her from left to right one time. it wasn't a strong shake just from side to side. Shes still crying so i sat her down in her crib and she still crying and she suddenly stops and begins to puke and seizing. I picked her up right after she stopped and i held her and she went to sleep so i let her sleep for about an hour and a half to two hours. She wakes up from her nap screaming so I changed her diaper and got her to eat 2 oz and i burped her She goes back to screaming and crying so i put her back down in the crib and turned on her mobile She stops looks at it and starts to lose responsiveness sound and touch. I get Mike (Shy's Dad) and [he] picks her up and she pukes and cleans her up and I'm calling 911 to stay on the phone with them for 11 plus minutes and Shy, Mike, and myself left and went to the closest hospital which was OSU.

Dkt. 9 (State's Ex. 10, Tyre's written statement (grammar, capitalization, and punctuation in original)).

Dr. Michael Baxter, a pediatrician who is board-certified in both general and child abuse pediatrics, examined and treated P.T. at the Children's Hospital. Dkt. 8-4, Tr. Trial vol. 3, at 45-58 [515-28], 92 [562]. According to Dr. Baxter, P.T. had bruising on both shoulders and one armpit, subdural bleeding on the left front side and in between the hemispheres of her brain, and bilateral retinal hemorrhaging, all of which he described as injuries consistent with P.T. being held forcefully by hands placed under her armpits and "an acceleration-deceleration mechanism, such as shaking." *Id.* at 101 [571], 109-12 [579-82]. P.T. spent eighteen days in the pediatric intensive care unit before returning home but required a feeding tube, seizure medication, and physical therapy for several months following her discharge from the hospital. *Id.* at 114-17 [584-87]; Dkt. 8-3, Tr. Trial vol. 2, at 121-30 [302-11], 144-60 [325-41].

Following an investigation, the State of Oklahoma charged Tyre with child abuse by injury, in violation of Okla. Stat. tit. 21, § 843.5(A), and child neglect, in violation of Okla. Stat. tit. 21, § 843.5(C). Dkt. 8-10, at 20. Tyre's case proceeded to a jury trial, and the jury found him guilty as charged. Dkt. 7-9, at 1. The jury recommended eight years' imprisonment as to the conviction

of child abuse and twelve years' imprisonment as to the conviction of child neglect.  *Id.*  The trial

court sentenced Tyre accordingly and ordered the sentences to be served consecutively.  *Id.*  Tyre

filed a direct appeal in the Oklahoma Court of Criminal Appeals ("OCCA"), asserting three claims.

*Id.* at 2.  First, he claimed he was deprived of his Sixth Amendment right to the effective assistance

of counsel because trial counsel conceded his guilt as to the charge of child abuse during closing

argument without his permission.  *Id.* at 2-6.  Second, he claimed he was deprived of his Fourteenth

Amendment right to a fair trial because the prosecutor made remarks during closing argument to

inflame the passions of the jury and elicit sympathy for the victim.  *Id.* at 6-7.  Third, he claimed

the trial court improperly admitted opinion testimony from Dr. Baxter that "told the jurors what

result to reach."  *Id.* at 7-8.  The OCCA remanded the case for an evidentiary hearing as to the

ineffective-assistance-of-counsel claim.  Dkt. 7-5.  Ultimately, the OCCA rejected all three claims

and affirmed Tyre's judgment and sentence.  Dkt. 7-9, at 2-8.  Tyre subsequently filed an

application for postconviction relief, the state district court dismissed the application, and Tyre did

not file a postconviction appeal.  Dkts. 7-10, 7-12; Dkt. 7, at 2.

Tyre seeks federal habeas relief, reasserting the same three claims he presented to the

OCCA on direct appeal.  Respondent urges the Court to deny the Petition, asserting that 28 U.S.C.

§ 2254(d) bars relief as to the first two claims and that Tyre's third claim alleges only an error of

state law.

## DISCUSSION

A federal court has discretion to issue a writ of habeas corpus to a state prisoner who

demonstrates that he is "in custody in violation of the Constitution or laws or treaties of the United

States."  28 U.S.C. § 2254(a).  But that discretion is sharply limited by provisions of the

Antiterrorism and Death Penalty Act of 1996 ("AEDPA") and federal habeas jurisprudence.  As

relevant here, when a state court has adjudicated a federal claim on the merits, a federal court "shall not" grant relief unless the prisoner first shows that the state court's adjudication of that claim either "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1),[3] or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). The prisoner "carries the burden of proof" in satisfying these standards. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). And the burden is heavy; it requires the prisoner to "show[] there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98 (2011); *see also Meek v. Martin*, 74 F.4th 1223, 1248 (10th Cir. 2023) (noting that to satisfy § 2254(d)'s demanding standards, "[t]he prisoner must show that a state court's decision is 'so obviously wrong' that no reasonable judge could arrive at the same conclusion given the facts of the prisoner's case" (quoting *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (*per curiam*))).

Moreover, even if a state prisoner satisfies § 2254(d)'s preconditions to relief, a federal court need not grant habeas relief. *See Horn v. Banks*, 536 U.S. 266, 272 (2002) ("While it is of course a necessary prerequisite to federal habeas relief that a prisoner satisfy the AEDPA standard of review set forth in 28 U.S.C. § 2254(d) . . . none of our post-AEDPA cases have suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard"). Rather, the prisoner "must still . . . persuade a federal habeas court that 'law and justice require' relief." *Brown v. Davenport*, 596 U.S. 118, 134 (2022) (quoting 28 U.S.C. § 2243). Thus, even

---

[3] The phrase "clearly established Federal law," as used in § 2254(d)(1), "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Bonney v. Wilson*, 754 F.3d 872, 880 (10th Cir. 2014) (citation and internal quotation marks omitted).

if a federal court finds that a constitutional error occurred, the court may not remedy the constitutional error by granting a writ of habeas corpus unless the state prisoner also "show[s] that the error had a '"substantial and injurious effect or influence"' on the outcome of [the] trial." *Id.* at 126 (alterations added) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

With these standards in mind, the Court turns to Tyre's claims.

## I.      Claim one:  ineffective assistance of counsel

Tyre claims he was deprived of his Sixth Amendment right to counsel because trial counsel conceded Tyre's guilt as to the charge of child abuse during closing argument without first consulting Tyre and obtaining Tyre's consent to make that concession.  Dkt. 1, at 21-33.

### A.      Clearly established federal law

The Sixth Amendment, applicable to the states through the Fourteenth Amendment, guarantees a criminal defendant the right to the assistance of counsel.  U.S. Const. amend. VI; *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The Supreme Court has interpreted that right to require the effective assistance of counsel.  *Strickland*, 466 U.S. at 686; *see McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970) ("It has long been recognized that the right to counsel is the right to the effective assistance of counsel.").  Counsel can "deprive a defendant of the right to effective assistance simply by failing to render adequate legal assistance." *Strickland*, 466 U.S. at 686 (citation and internal quotation marks omitted).  But "the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688. And "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.*  To prevail on a claim that counsel provided constitutionally inadequate assistance, a defendant must show both deficient performance and resulting prejudice.

*Id.* at 687, 694.  To establish deficient performance, a defendant must show that "counsel's representation fell below an objective standard of reasonableness."  *Id.* at 687.  To establish prejudice, a defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.

Beyond *Strickland*, the Supreme Court has issued two decisions addressing Tyre's specific claim that trial counsel provided constitutionally deficient representation by conceding guilt without Tyre's permission.  In the more recent case, *McCoy v. Louisiana*, 584 U.S. 414 (2018), the Supreme Court succinctly stated its holdings in both cases that address this issue:

> In *Florida v. Nixon*, 543 U.S. 175, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004), this Court considered whether the Constitution bars defense counsel from conceding a capital defendant's guilt at trial "when [the] defendant, informed by counsel, neither consents nor objects," *id.*, at 178, 125 S. Ct. 551.  In that case, defense counsel had several times explained to the defendant a proposed guilt-phase concession strategy, but the defendant was unresponsive.  *Id.*, at 186, 125 S. Ct. 551.  We held that when counsel confers with the defendant and the defendant remains silent, neither approving nor protesting counsel's proposed concession strategy, *id.*, at 181, 125 S. Ct. 551, "[no] blanket rule demand[s] the defendant's explicit consent" to implementation of that strategy, *id.*, at 192, 125 S. Ct. 551.

> In the case now before us, in contrast to *Nixon*, the defendant vociferously insisted that he did not engage in the charged acts and adamantly objected to any admission of guilt.  App. 286–287, 505–506.  Yet the trial court permitted counsel, at the guilt phase of a capital trial, to tell the jury the defendant "committed three murders. . . . [H]e's guilty."  *Id.*, at 509, 510.  We hold that a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty.  Guaranteeing a defendant the right "to have the Assistance of Counsel for his defence," the Sixth Amendment so demands.  With individual liberty—and, in capital cases, life—at stake, it is the defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt.

*McCoy*, 584 U.S. at 417-18.  The *McCoy* Court reasoned that while the Sixth Amendment provides for the assistance of counsel, "a defendant need not surrender control entirely to counsel."  *Id.* at 421.  The *McCoy* Court explained:

Trial management is the lawyer's province:  Counsel provides his or her assistance by making decisions such as "what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence." *Gonzalez v. United States*, 553 U.S. 242, 248, 128 S. Ct. 1765, 170 L. Ed. 2d 616 (2008) (internal quotation marks and citations omitted).   Some decisions, however, are reserved for the client—notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal.  *See Jones v. Barnes*, 463 U.S. 745, 751, 103 S. Ct. 3308, 77 L.Ed.2d 987 (1983).

Autonomy to decide that the objective of the defense is to assert innocence belongs in this latter category.  Just as a defendant may steadfastly refuse to plead guilty in the face of overwhelming evidence against her, or reject the assistance of legal counsel despite the defendant's own inexperience and lack of professional qualifications, so may she insist on maintaining her innocence at the guilt phase of a capital trial.  These are not strategic choices about how best to *achieve* a client's objectives; they are choices about what the client's objectives in fact *are*.

*McCoy*, 584 U.S. at 422 (emphases in original).

Nixon and *McCoy* adopted two distinct approaches to evaluating a Sixth Amendment claim arising from counsel's concession of a defendant's guilt.  The *Nixon* Court described the case before it as "concern[ing] defense counsel's strategic decision to concede, at the guilt phase of the trial, the defendant's commission of murder, and to concentrate the defense on establishing, at the penalty phase, cause for sparing the defendant's life." *Nixon*, 543 U.S. at 178.  And the *Nixon* Court framed the question presented in the case as "whether counsel's failure to obtain the defendant's express consent to a strategy of conceding guilt in a capital trial automatically renders counsel's performance deficient, and whether counsel's effectiveness should be evaluated under [*United States v.*] *Cronic*[, 466 U.S. 648 (1984)] or *Strickland*." *Id.* at 186-87.  As the *Nixon* Court explained,

*Cronic* recognized a narrow exception to *Strickland*'s holding that a defendant who asserts ineffective assistance of counsel must demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the defense.  *Cronic* instructed that a presumption of prejudice would be in order in "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified."  466 U.S., at 658, 104 S. Ct. 2039.  The Court elaborated:  "[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment

8

rights that makes the adversary process itself presumptively unreliable." *Id.*, at 659, 104 S. Ct. 2039; *see Bell v. Cone*, 535 U.S. 685, 696-697, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (for *Cronic*'s presumed prejudice standard to apply, counsel's "failure must be complete"). We illustrated just how infrequently the "surrounding circumstances [will] justify a presumption of ineffectiveness" in *Cronic* itself. In that case, we reversed a Court of Appeals ruling that ranked as prejudicially inadequate the performance of an inexperienced, underprepared attorney in a complex mail fraud trial. 466 U.S., at 662, 666, 104 S. Ct. 2039.

*Nixon*, 543 U.S. at 190. The *Nixon* Court rejected the Florida Supreme Court's determination that any concession of guilt "made without the defendant's express consent . . . automatically ranks as prejudicial ineffective assistance of counsel necessitating a new trial." *Id.* at 178. Rather, the *Nixon* Court explained,

> Defense counsel undoubtedly has a duty to discuss potential strategies with the defendant. *See Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984). But when a defendant, informed by counsel, neither consents nor objects to the course counsel describes as the most promising means to avert a sentence of death, counsel is not automatically barred from pursuing that course. The reasonableness of counsel's performance, after consultation with the defendant yields no response, must be judged in accord with the inquiry generally applicable to ineffective-assistance-of-counsel claims: Did counsel's representation "f[a]ll below an objective standard of reasonableness"? *Id.*, at 688, 694, 104 S. Ct. 2052. The Florida Supreme Court erred in applying, instead, a presumption of deficient performance, as well as a presumption of prejudice; that latter presumption, we have instructed, is reserved for cases in which counsel fails meaningfully to oppose the prosecution's case. *United States v. Cronic*, 466 U.S. 648, 659, 104 S. Ct. 2039, 80 L.Ed.2d 657 (1984). A presumption of prejudice is not in order based solely on a defendant's failure to provide express consent to a tenable strategy counsel has adequately disclosed to and discussed with the defendant.

*Nixon*, 543 U.S. at 178-79. In summarizing its decision, the *Nixon* Court stated,

> [I]n a capital case, counsel must consider in conjunction both the guilt and penalty phases in determining how best to proceed. When counsel informs the defendant of the strategy counsel believes to be in the defendant's best interest and the defendant is unresponsive, counsel's strategic choice is not impeded by any blanket rule demanding the defendant's explicit consent. Instead, if counsel's strategy, given the evidence bearing on the defendant's guilt, satisfies the *Strickland* standard, that is the end of the matter; no tenable claim of ineffective assistance would remain.

*Id.* at 192.

9

As previously stated, the *McCoy* Court described the case before it as involving a defendant who "vociferously insisted that he did not engage in the charged acts and adamantly objected to any admission of guilt. *McCoy*, 584 U.S. at 417.   And the *McCoy* Court identified the question presented in the case as "whether it is unconstitutional to allow defense counsel to concede guilt over the defendant's intransigent and unambiguous objection." *Id.* at 420.  After holding that the Sixth Amendment guarantee of the assistance of counsel "demands" "that a defendant has the right to insist that counsel refrain from admitting guilt," *id.* at 417, the *McCoy* Court clarified that *Strickland*'s two-part inquiry does not apply when "a client's autonomy, not counsel's competence, is in issue." *Id.* at 426.  The *McCoy* Court specifically held that a defendant who shows a "violation of [his] protected autonomy right" need not show prejudice because "[v]iolation of a defendant's Sixth Amendment-secured autonomy ranks as error of the kind our decisions have called "structural"; when present, such an error is not subject to harmless-error review." *Id.* at 427-28.

**B.     Additional facts**

Before adjudicating Tyre's Sixth Amendment claim, the OCCA remanded the case for an evidentiary hearing and specifically directed the state district court to receive evidence as to four issues:

> 1. Whether trial counsel conceded Appellant's guilt to Count 1 in counsel's statements to the jury during closing argument; and,
>
> 2. if counsel conceded guilt, whether trial counsel consulted with the Appellant about this strategy before closing argument; and
>
> 3. whether trial counsel sought Appellant's consent to this strategy before closing argument; and
>
> 4. whether the Appellant gave his consent to, or acquiesced in, defense counsel's concession strategy before closing argument.

Dkt. 7-5, at 7.

At the beginning of the hearing, the parties stipulated that Tyre's trial counsel, Brian Martin, conceded Tyre's guilt, as to the charge of child abuse, during closing argument. Dkt. 8-8, Tr. Evid. Hr'g, at 7. The state district court accepted that stipulation and heard testimony from two witnesses at the evidentiary hearing: Tyre and Martin.

Tyre testified that he initially hired Dechard Thomas and Bill Sellers to represent him at trial. *Id.* at 14. Sellers withdrew from the case after Tyre's preliminary hearing, but Thomas continued to represent Tyre. *Id.* at 14-15. At some point, Thomas retained an expert witness, Dr. Thomas Young. *Id.* at 15. According to Tyre, an April 2016 report obtained from Dr. Young indicates that Young would have testified at trial that "it is not reasonable to surmise or even diagnose abuse in a violent event no one saw when witness accounts provide natural explanations for everything that happened to the child." *Id.* at 16. Tyre testified that Martin entered his appearance in the case in May 2016 because Thomas had no criminal trial experience. *Id.* at 17-18. Tyre testified that he regularly communicated with Thomas and Martin before trial and that he understood that the trial strategy would include calling "a doctor to testify on [his] behalf." *Id.* at 18-19, 26-27. Tyre denied that he had any discussions with Thomas and Martin about a "strategy that involved conceding guilt on Count 1" and testified that his attorneys neither sought nor obtained his consent to pursue that strategy. *Id.* at 19, 28. Tyre testified that he visited Martin's office on the first day of trial, after jury selection, that Thomas was not present for that meeting, and that the meeting proceeded as follows: "There wasn't too much of a discussion, there was more so – [Martin] thought it out that – I had already done it, so he told me that, you know, I was gonna take a hit for this, you know, if I had done it or not, and that was the premise of the rest of the conversation." *Id.* at 19-20. Tyre denied that Martin discussed with him at that meeting, or at any other time before closing argument, that Martin would concede Tyre's guilt as to the charge

of child abuse. *Id.* at 20.  Tyre testified that he was "shocked" and "surprised" when Martin conceded guilt during closing argument and that he did not agree with the decision to concede guilt. *Id.* at 23, 25.  Tyre also testified that Martin told him on the first day of trial that the defense "no longer needed" Dr. Young and that Martin explained to him that "it would piss the jury off" if "one expert testif[ied] to shaken baby syndrome and another testif[ied] to epilepsy." *Id.* at 28.

Martin testified that he entered an appearance in the case, after Tyre's preliminary hearing and at Thomas's request, because Thomas had no criminal trial experience.  Dkt. 8-8, Tr. Evid. Hr'g, at 32-33.  Martin testified that he reviewed the discovery before speaking to Tyre, that the discovery indicated Tyre admitted to shaking P.T., and that he spoke with Tyre six to eight times before trial. *Id.* at 34.  According to Martin, he discussed with Tyre that presenting an expert "to show that this was not shaken baby" "did not seem like a strategy that would sit well with the jury" considering that Tyre admitted to shaking P.T. *Id.* at 35, 37.  Martin testified "[s]o there was a discussion about conceding guilt with regards to that count but fighting the second count." *Id.* at 35.  Martin further testified that this strategy "wasn't something that [Tyre] accepted initially . . . but over the course of the relationship he grew to understand that that was the most logical avenue to take." *Id.*  According to Martin, Tyre reached this understanding before the jury trial. *Id.* at 35-36.  Martin testified that he "absolutely" sought Tyre's consent to pursue the strategy of conceding guilt as to child abuse. *Id.* at 37.  When asked how Tyre indicated his understanding of this strategy, Martin testified:

> Oh, he -- he -- like I said, it's -- a client is not gonna be happy when you talk to them about conceding guilt at the -- first conversation.  But over the course of the conversations, he began to recognize that the strategy that had been developed by Mr. Thomas with the expert was most likely not going to be favorable, and that conceding guilt and fighting the child neglect charge, given his young age, given that the child, while she had injuries, was not far off the scale of however children develop, he began to recognize and accepted the fact that that would be the best strategy.

*Id.* at 37-38.  Martin also testified that he discussed the concession strategy with Tyre "multiple times" and that Tyre either gave his consent to the strategy of conceding guilt or acquiesced to that strategy before trial.  *Id.* at 38, 51-53.  When asked if he had knowledge of the trial strategy that Tyre discussed with Thomas, Martin testified that he knew about the strategy of calling an expert witness before he became involved in the case, but he had no specific recollection of jointly meeting with Tyre and Thomas after he became involved in the case.  *Id.* at 39.  Martin testified that he discussed the strategy of conceding guilt with Tyre during his first or second meeting with Tyre and before trial.  *Id.* at 40, 48.  According to Martin, Tyre acknowledged that the concession strategy "would save face with the jury with regards to Count 1" and that pursuing this strategy would require an admission of guilt as to Count 1.  *Id.* at 41-42.  Martin also testified that he told Tyre before trial that he had no intention of calling an expert witness and Martin recalled Tyre's mother being upset about the decision not to call the expert witness that she had paid $5,000 to retain.  *Id.* at 43-45.  Martin did not recall Tyre's response to the decision not to call an expert witness.  *Id.* at 45-46.  Martin admitted that he was not familiar, at the time of Tyre's trial, with the name of the "case law when it comes to conceding guilt," but he testified that he did know that

he should seek the client's consent before conceding guilt.  *Id.* at 46, 53-54.[4]  Martin testified that

he became aware, about three or four months before the evidentiary hearing, that case law requires

a record to be made at trial when the defendant consents to conceding guilt.  *Id.* at 46-47.

Following the evidentiary hearing, the state district court issued written findings of fact

and conclusions of law.  Dkt. 7-6.  The state district court found:  (1) that Martin conceded Tyre's

guilt as to the charge of child abuse during closing argument; (2) that Martin discussed the

concession strategy several times with Tyre before closing argument; (3) that Martin sought Tyre's

consent regarding the concession strategy before closing argument; and (4) "that Tyre consented

and/or acquiesced to the concession strategy before closing argument."  *Id.* at 3-4.  In making these

findings, the state district court noted that it found Martin's testimony more credible than Tyre's

testimony.  *Id.* at 2-3.  The state district court explained that its finding that Tyre acquiesced to the

concession strategy was supported both by Tyre's "demeanor" during trial and by the fact that

"Tyre did not at any time—prior to trial, during trial or at sentencing—inform [the trial court] that

he disagreed with the concession strategy."  *Id.* at 4-5.

After permitting both parties to file supplemental appellate briefs, the OCCA evaluated

---

[4] The "case law" Martin referred to is *Jackson v. State*, 41 P.3d 395 (Okla. Crim. App. 2001).  Dkt. 7-5, at 3; Dkt. 8-8, at 5.  In *Jackson*, the OCCA reaffirmed its position "that a concession of guilt does not amount to ineffective assistance of counsel, *per se*."  41 P.3d at 399.  But the OCCA concluded that because "the decision to concede guilt must be the client's ultimate decision," "a complete concession of guilt is a serious strategic decision that must only be made after consulting with the client and after receiving the client's consent or acquiescence."  *Id.* at 400.  The OCCA held "that a complete concession of guilt during the first stage of a capital trial must only be made with the client's consent or acquiescence."  *Id.*  The OCCA also recognized that attempting to determine the existence of consent or acquiescence "months after the fact in an evidentiary hearing" had "proven to be problematic."  *Id.* at 401.  The OCCA thus established certain procedures for future cases, stating, "if counsel chooses [a concession] strategy the trial court shall be informed before trial, or at least prior to the concessions being announced to the jury, and the trial court shall determine from counsel and the defendant, on the record, whether this strategy is one in which the client has consented or acquiesced.  If the client does not consent to or acquiesce in the strategy, then counsel shall follow the client's wishes."  *Id.* at 400-01.

Tyre's Sixth Amendment claim under *McCoy*, *Nixon*, and *Strickland* and denied relief.  Dkts. 7-7,

7-8, 7-9.  Applying *McCoy* and *Nixon*, the OCCA reasoned:

> Though the testimony at the evidentiary hearing was conflicting on the main issues, we find that Judge Drummond's credibility choices as the finder of fact and his conclusions of law are supported by the record.  We therefore affirm Judge Drummond's conclusion that Appellant was aware of counsel's plan to concede and had either approved of the plan, or acquiesced in it, and cannot now obtain reversal based on counsel's concession despite the lack of conclusive evidence of his explicit consent.  *Abshier v. State*, 2001 OK CR 13, ¶¶ 75-76, 80, 28 P.3d 579, 598; *Florida v. Nixon*, 543 U.S. 175 (2004).  This is not a case where trial counsel usurped Appellant's autonomous authority to control the ultimate objectives of the defense.  *McCoy v. Louisiana*, 138 S. Ct. 1500 (2018).

Dkt. 7-9, at 5.

Then, applying *Strickland*, the OCCA determined "that counsel's plan to concede guilt in

Count 1 was not unreasonably deficient."  *Id.*  The OCCA found, however, that "trial counsel was

deficient in one important respect" because Martin "admitted at the evidentiary hearing [that] he

was unfamiliar at the time of trial with Oklahoma's "pre-concession disclosure procedure

promulgated in *Jackson v. State*, 2001 OK CR 37, ¶ 25, 41 P.3d 395, 400."  *Id.* at 5-6.  The OCCA

reasoned that Martin's "professional error" in failing to alert the trial court of his plan to concede

guilt and in failing to preserve a better record as to the concession strategy "made a post-trial attack

on the concession strategy much more likely" but the OCCA determined that this error did not

result in prejudice because it "did not create any reasonable probability of a different outcome at

trial."  *Id.* at 6.

### C.    Analysis

Respondent contends that § 2254(d) bars relief as to the Sixth Amendment claim because

the OCCA's decision is not contrary to clearly established federal law, does not involve an

unreasonable application of clearly established federal law, and is not based on an unreasonable

determination of the facts presented in state court.  Dkt. 7, at 7-9, 15-22.  Tyre appears to present

two arguments to support his view that § 2254(d) does not bar relief as to the Sixth Amendment claim. Neither is persuasive.

### 1.    Unreasonable factual determination under § 2254(d)(2)

First, Tyre contends that he can satisfy the precondition to relief described in § 2254(d)(2) because the OCCA's decision is based on an unreasonable determination of the facts presented in state court. Dkt. 1, at 17. Tyre appears to argue that it was unreasonable for the OCCA to defer to the state district court's determination that Martin's testimony was more credible than Tyre's testimony and that it was therefore unreasonable for the OCCA (1) to find that Tyre either consented or acquiesced to the strategy of conceding guilt and (2) to conclude that "this is not a case where trial counsel usurped Appellant's autonomous authority to control the ultimate objectives of the defense." Dkt. 1, at 22-28, 33.

Showing that a state court decision is based on an unreasonable factual determination is no easy task. "[I]f a petitioner alleges the state court's decision 'was based on an unreasonable determination of the facts' under § 2254(d)(2), it is not enough to show that 'reasonable minds reviewing the record might disagree about the finding in question.'" *Davenport*, 596 U.S. at 135 (quoting *Brumfield v. Cain*, 576 U.S. 305, 314 (2015)). Rather, a petitioner must show either that the state "court plainly and materially misstated the record" or "that reasonable minds could not disagree that the finding was in error." *Smith v. Duckworth*, 824 F.3d 1233, 1250 (10th Cir. 2016). Moreover, under § 2254(e)(1), "any state-court findings of fact that bear upon [a petitioner's] claim are entitled to a presumption of correctness rebuttable only by clear and convincing evidence." *Simpson v. Carpenter*, 912 F.3d 542, 563 (10th Cir. 2018). And a federal habeas court "may not characterize [any] state-court factual determinations as unreasonable 'merely because [the court] would have reached a different conclusion in the first instance.'" *Brumfield*, 576 U.S. at 313-14

(quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).[5]

Respondent argues that Tyre's challenge to the reasonableness of the OCCA's factual determination "hinges upon an untenable strategy:  convincing this Court to reweigh the credibility of the witnesses that testified at the evidentiary hearing in the state district court."  Dkt. 7, at 15; *see* Dkt. 1, at 25 (discussing testimony from evidentiary hearing and arguing in the Petition that "[b]ecause the credibility of the two witnesses was comparable, and because Petitioner's memory as superior to Martin's the evidence established that Martin did not discuss the concession strategy with Petitioner or seek his consent").  The Court agrees.  As Respondent argues, "a state court's determination of witness credibility is treated as a finding of fact on habeas review."  Dkt. 7, at 16 (quoting *Church v. Sullivan*, 942 F.2d 1501, 1516 (10th Cir. 1991)).   And credibility determinations made by a state court—particularly the state court that observed testifying witnesses—are entitled to great deference.  *See Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (explaining in a pre-AEDPA case that "28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them").

In any event, this Court has thoroughly reviewed the transcripts from the evidentiary hearing and from Tyre's trial, the state district court's written findings of fact and conclusions of law, and the OCCA's decision.  The record fully supports the reasonableness of the OCCA's factual determinations underlying its decision.  Significantly, the state district court acknowledged,

---

[5] The *Strickland* Court explained that "in a federal habeas challenge to a state criminal judgment, a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by § 2254(d)."  466 U.S. at 698.  Instead, the ultimate question of whether counsel was effective is a mixed question of law and fact.  *Id.*  Nonetheless, "state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of § 2254(d)."  *Id.*

and the record supports, that Martin and Tyre gave conflicting testimony at the evidentiary hearing regarding whether Tyre consented to a concession strategy. *See* Dkt. 7-6, at 4 (stating that "Martin testified unequivocally that he obtained Tyre's consent to the concession strategy" and that "Tyre testified that he did not consent or agree to the concession strategy"). The state district court thoroughly discussed the conflicting evidence and the bases for its determination that "Martin's testimony was more believable" even though Martin "had difficulty remembering specifics." *Id.* at 3-6 & nn. 4-6. The OCCA likewise recognized that "the testimony at the evidentiary hearing was conflicting on the main issues" but found that the record supported the state district court's "credibility choices as the finder of fact." Dkt. 7-9, at 5. Given that the state district court observed the testimony of Tyre and Martin, it was objectively reasonable for the OCCA to defer to the state district court's credibility determinations, and this Court cannot reweigh those credibility determinations on habeas review. On the record presented, the Court thus concludes that Tyre has not shown that the OCCA based its decision as to the Sixth Amendment claim on an unreasonable determination of the facts presented in state court proceedings.

### 2.    Unreasonable application of the law under § 2254(d)(1)

Second, Tyre contends that he can satisfy the precondition to relief described in § 2254(d)(1) because the OCCA's decision involved an unreasonable application of *McCoy*,

*Nixon*, and *Strickland*.  Dkt. 1, at 28-33.[6]  Tyre appears to argue that the facts of his case are

significantly different than the facts in *Nixon* because, unlike the defendant in *Nixon*, Tyre

regularly communicated with Martin before trial.  Dkt. 1, at 25-26, 28-29.  Tyre also quotes several

passages from *McCoy* and appears to argue that like the trial counsel in *McCoy*, Martin could not

"override Tyre's objection" to a concession of guilt.  *Id.* at 29-33.  Lastly, Tyre appears to argue

that the OCCA unreasonably applied *Strickland* because Martin "was unaware of the law

pertaining to conceding guilt and failed to make the required record" and, in Tyre's view, the

evidence against him was not "so overwhelming that conceding guilt was the only viable strategy."

*Id.* at 18, 22, 25.

A state court decision involves an unreasonable application of clearly established law if the

state court correctly identifies the clearly established federal law governing the petitioner's claim

but unreasonably applies that law to the facts of the petitioner's case.  *Owens v. Trammell*, 792

F.3d 1234, 1242 (10th Cir. 2015).  The crux of Tyre's Sixth Amendment claim, as he presented it

to the OCCA and as he presents it in this proceeding, is that Martin conceded his guilt as to the

charge of child abuse without consulting Tyre or obtaining Tyre's consent to make that concession.

---

[6] Tyre's arguments on this point are not well-written.  But because Tyre is represented by counsel, the Court does not read the Petition with the same leniency it must afford to an unrepresented litigant.  Nonetheless, in any case, "[p]leadings must be construed so as to do justice." Fed. R. Civ. P. 8(e).  The Court therefore reads Tyre's assertion that the OCCA's decision is "an unreasonable application of the facts" as attempting to show that the OCCA unreasonably applied *Strickland*, *McCoy*, and *Nixon* to the facts of his case. Dkt. 1, at 33.  The Court, however, does not construe the Petition as making any arguments to support Tyre's assertion that the OCCA's decision is contrary to clearly established federal law. Dkt. 1, at 17-33.  Tyre also appears to argue that the OCCA's decision conflicts with several state court decisions.  *Id.* at 22-28.  But the role of a federal habeas court is to determine whether a state court unreasonably applied clearly established federal law, not to question whether a state court correctly applied state law.  *Graham v. White*, ___ F. 4th ___, 2024 WL 2228601, at *6-7 (10th Cir. May 17, 2024).  For these reasons, the Court confines its analysis under § 2254(d)(1) to the unreasonable-application prong and the arguments Tyre makes that appear to address that prong.

In the appellate brief Tyre presented to the OCCA, Tyre argued that Martin's decision to concede guilt without his consent constituted deficient and prejudicial performance under *Strickland*. Dkt. 7-2, at 10-13. In the supplemental brief Tyre filed in the OCCA following the evidentiary hearing on his Sixth Amendment claim, Tyre additionally argued that Martin's decision to concede guilt during closing argument, without consulting Tyre or obtaining his consent, was structural error under *McCoy* and that the state district court erred when it reasoned that the facts in Tyre's case were more like the facts presented in *Nixon* than the facts presented in *McCoy*. Dkt. 7-7, at 7, 12-15.

In response to these arguments, the OCCA identified *McCoy*, *Nixon*, and *Strickland* as the clearly established federal law governing Tyre's Sixth Amendment claim. Dkt. 7-9, at 5-6. But Tyre has not shown that the OCCA's decision involved an unreasonable application of the holdings from these cases. The OCCA first evaluated Tyre's claim under *McCoy* and determined that the facts did not support Tyre's position that trial counsel "usurped [Tyre's] autonomous authority to control the ultimate objectives of the defense." Dkt. 7-9, at 5. The record demonstrates the objective reasonableness of the OCCA's application of *McCoy* to the facts of this case. Nothing in the record, other than Tyre's testimony at the evidentiary hearing, suggests, let alone shows, that trial counsel "concede[d] guilt over [Tyre's] intransigent and unambiguous objection." *McCoy*, 584 U.S. at 420. Rather, as the OCCA reasoned, the facts in this case are more analogous to the facts in *Nixon* because Martin testified that he spoke with Tyre "multiple times" about pursuing a concession strategy before trial and Tyre did not voice any objections to that strategy until he filed a direct appeal. *See McCoy*, 584 U.S. at 417 (describing *Nixon* as holding "that when counsel confers with the defendant and the defendant remains silent, neither approving nor protesting counsel's proposed concession strategy . . . '[no] blanket rule demand[s] the defendant's

20

explicit consent" to implementation of that strategy'" (alterations in original) (internal citations omitted)).

Further, because the OCCA reasonably determined that Tyre's case was more analogous to *Nixon* than *McCoy*, it also was objectively reasonable for the OCCA to follow *Nixon*'s approach in evaluating Tyre's Sixth Amendment claim under *Strickland*. *See Nixon*, 543 U.S. at 178 ("The reasonableness of counsel's performance, after consultation with the defendant [about conceding guilt] yields no response, must be judged in accord with the inquiry generally applicable to ineffective-assistance-of-counsel claims:  Did counsel's representation 'f[a]ll below an objective standard of reasonableness'?"  (quoting *Strickland*, 466 U.S. 688, 694)).  Applying *Strickland* to the facts of the case, the OCCA reasonably concluded that Martin was deficient for failing to understand the procedures that the OCCA established in *Jackson*, a case the OCCA decided more than a decade before Tyre's trial.  Dkt. 7-9, at 6.  The OCCA nonetheless concluded, on the facts presented—which included the weight of Tyre's voluntary statements about his actions that caused P.T.'s injuries—that Tyre failed to establish *Strickland* prejudice.  *Id.* at 6.

Having thoroughly reviewed the state court record, the Court finds that Tyre has not shown that the OCCA's decision as to the Sixth Amendment claim involved an unreasonable application of *McCoy*, *Nixon*, or *Strickland*.

### D.     Conclusion as to claim one

In sum, Tyre has not shown that the OCCA's decision as to his Sixth Amendment claim either is based on an unreasonable determination of the facts or involved an unreasonable application of clearly established federal law.  Section 2254(d) therefore bars relief, and the Court denies the Petition as to claim one.

II.      **Claim two:  prosecutorial misconduct**

Next, Tyre claims the State violated his Fourteenth Amendment right to due process and deprived him of a fair trial because the prosecutor made remarks during closing argument to inflame the passions of the jury and elicit sympathy for the victim.  Dkt. 1, at 34-36.

A.      **Clearly established federal law**

When a defendant claims that a prosecutor made improper remarks during closing argument, the relevant question for the reviewing court is whether the challenged remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  In answering that question, the reviewing court must conduct an "examination of the entire proceedings," *id.*, and consider whether the challenged remarks were "invited by" or "responsive to" arguments made by defense counsel and whether the "weight of the evidence . . . reduced the likelihood that the jury's decision was influenced by argument," *Darden v. Wainwright*, 477 U.S. 168, 182 (1986).  The reviewing court should also consider whether any curative instructions from the trial court may have mitigated the effect on the jury of any improper remarks.  *Fero v. Kerby*, 39 F.3d 1462, 1474 (10th Cir. 1994) (citation and internal quotation marks omitted).

B.      **Additional facts**

At trial, the State presented evidence establishing that Tyre admitted to a law enforcement officer that he became frustrated while caring for his three-month-old daughter, P.T., that he forcefully grabbed P.T., questioned in a "loud voice" why she was being fussy, and shook P.T.; that Tyre saw P.T. vomit and experience a seizure immediately after he shook her; that Tyre cleaned up the vomit and put P.T. down for a two-hour nap; that P.T. woke up from the nap screaming; and that Tyre saw P.T. become nonresponsive to touch and sound after he fed her and

placed her back in her crib.  Dkt. 9 (State's Exs. 9, 10).  The State also presented evidence

establishing that P.T. sustained bruises on her chest and armpits, a subdural hematoma, and

bilateral retinal hemorrhaging—all of which were consistent with injuries from being forcefully

grabbed and shaken—and that Tyre did not immediately seek medical attention for P.T. when P.T.

first experienced a seizure and vomiting after he shook her.  *Id.*; Dkt. 8-3, Tr. Trial vol. 2, at 76-

87 [257-68]; Dkt. 8-4, Tr. Trial vol. 3, at 45-58 [515-28], 92 [562], 101 [571], 109-12 [579-82].

During the State's initial closing argument, the prosecutor stated:

> P.T. did not deserve any of this.  She was way too young and just a baby.
> She wasn't in any way trying to be bad.  She wasn't in any way trying to irritate or
> frustrate anyone or get under anyone's skin.  She didn't have the developmental
> ability to do that yet.  She was just doing what three-month-old babies do.  She was
> just letting her dad know that either she was hungry or she needed to be changed or
> maybe she just wanted to be held.

> When he got so mad at her, when he got so frustrated with her for that, she
> had absolutely no way to defend herself.  She couldn't fight back in any way.  She
> couldn't yell at him to stop.  She couldn't run for help.  She couldn't call 9-1-1.
> She absolutely had no ability to defend herself from what he was doing to her.  She
> just had to take it.

> Even though she was way too young to be able to defend herself or to be
> able to fight back, P.T. was not too young to know pain.  P.T. was not too young to
> know fear.  And you can only begin to imagine what she felt and what she
> experienced as she was grabbed so forcefully that it bruised her.  And as she was
> shaken so violently that it did all of the damage that it did to her, as she was being
> yelled at in her face.

Dkt. 8-5, Tr. Trial vol. 4, at 18-19 [651-52].

On direct appeal, Tyre argued that the prosecutor's remarks "ran afoul of" the OCCA's

"well-established rule" barring "even subtle appeals to sympathy for the victims" and also violated

his constitutional right to due process.  Dkt. 7-2, at 14-16.  Because Tyre did not object at trial to

the prosecutor's statements, the OCCA reviewed his prosecutorial misconduct claim for plain

error.  Dkt. 7-9, at 6.  The OCCA stated that it would grant relief "for prosecutorial misconduct

only where it rendered the trial fundamentally unfair," and "only where grossly improper and

23

unwarranted argument affects a defendant's rights," and that it would review "allegations of prosecutorial misconduct within the context of the trial, considering the propriety of the prosecutor's actions, the strength of the evidence, and corresponding arguments of defense counsel." *Id.* at 6-7. Applying these legal standards, the OCCA found "no plain or obvious error in the prosecutor's comments." *Id.* at 7.

### C.   Analysis and conclusion

Respondent contends that § 2254(d) bars relief as to this claim because the OCCA's ruling is not contrary to clearly established law, does not involve an unreasonable application of clearly established federal law, and is not based on an unreasonable determination of the facts presented in state court. Dkt. 7, at 24-27. Tyre appears to make two arguments to support his position that § 2254(d) does not bar relief as to the prosecutorial misconduct claim. Because neither argument is persuasive, the Court agrees with Respondent that § 2254(d) bars relief.

First, Tyre argues that the OCCA's decision rejecting this claim is unreasonable because the OCCA "summarily denie[d]" the claim "without explanation in its summary opinion." Dkt. 1, at 37. The Supreme Court rejected this same argument more than a decade ago. *See Richter*, 562 U.S. at 98 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."). This Court likewise rejects Tyre's argument that he can satisfy the preconditions to relief described in § 2254(d) merely by asserting that the OCCA did not provide an adequately detailed explanation for rejecting his claim.

Second, as he did on direct appeal, Tyre primarily relies on state law and American Bar Association Standards to argue that a prosecutor is prohibited from making arguments to inflame the passions of the jury and elicit sympathy for the victim. Dkt. 1, at 34-36. The United States

Court of Appeals for the Tenth Circuit also has recognized that these kinds of arguments are improper.  *See, e.g.*, *Le v. Mullin*, 311 F.3d 1002, 1015 (10th Cir. 2002) ("It is a hallmark of a fair and civilized justice system that verdicts be based on reason, not emotion, revenge, or even sympathy."); *Moore v. Gibson*, 195 F.3d 1152, 1172 (10th Cir. 1999) ("This court does not condone prosecutorial remarks encouraging the jury to allow sympathy to influence its decision."). But the problem for Tyre is that he has not identified any Supreme Court precedent clearly establishing that a prosecutor's remarks necessarily violate the Fourteenth Amendment's due process clause if those remarks either inflame the passions of a jury or elicit sympathy for the victim.  *See Parker v. Matthews*, 567 U.S. 37, 48 (2012) (reiterating that *Darden* provides a general standard for evaluating prosecutorial misconduct claims and that "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' and thus "cannot form the basis for habeas relief under AEDPA").  And because *Darden* sets out a general standard, state courts have more leeway in applying that standard to determine whether, in a specific case, a prosecutor's remarks were so egregious that they deprived a criminal defendant of his right to due process.  *Id.*  Here, the OCCA identified and applied the general legal principles from *DeChristoforo* and *Darden* when it determined that the prosecutor's remarks did not deprive Tyre of his right to a fair trial.  Dkt. 7-9, at 5-6.  Tyre has not explained, through any of his arguments, how the OCCA's decision unreasonably applied these legal principles.

Regardless, this Court has carefully reviewed the trial transcripts and finds that while the prosecutor's remarks may have been improper attempts to elicit sympathy for P.T. or to inflame the passions of the jury, it was nonetheless objectively reasonable for the OCCA to conclude that those remarks were not so egregious, considering the entire record, that they deprived Tyre of his constitutional right to a fair trial.  Critically, "[n]ot every improper and unfair remark made by a

prosecutor will amount to a federal constitutional deprivation." *Moore*, 195 F.3d at 1171; *see also Darden*, 477 U.S. at 181 (citing with approval lower court's statement that it "is not enough that the prosecutors' remarks were undesirable or even universally condemned").  And, for several reasons, the circumstances of this case support the reasonableness of the OCCA's decision.  First, and foremost, the weight of the evidence against Tyre was strong.  Tyre admitted to a law enforcement officer, both verbally and in writing, that he became frustrated with P.T. while he was her sole caregiver, that he grabbed her "forcefully" and shook her, that she vomited and suffered a seizure, that he cleaned her up and left her in her crib for two hours, and that he sought medical care only after witnessing P.T. experience a second seizure, vomit again, and become nonresponsive. Dkt. 9 (State's Exs. 9, 10).  Second, as previously discussed, trial counsel conceded Tyre's guilt as to the charge of child abuse in closing argument.  That concession, as well as Tyre's own admissions, likely carried greater weight with the jury than the prosecutor's remarks.  Third, the trial court advised the jury, at the beginning of trial and during two different portions of the prosecutor's initial closing argument, that the prosecutor's remarks were not evidence and were made "for persuasive purposes only." Dkt. 8-3, Tr. Trial vol. 3, at 56; Dkt. 8-5, Tr. Trial vol. 4, at 33-34.  These instructions no doubt mitigated the impact of the prosecutor's improper pleas for sympathy and improper attempts to inflame the passions of the jury.

Based on the foregoing, the Court concludes that Tyre has not shown that the OCCA's decision as to his prosecutorial misconduct claim is contrary to clearly established federal law, involved an unreasonable application of clearly established federal law, or is based on an unreasonable determination of the facts.  Section 2254(d) therefore bars relief, and the Court denies the Petition as to claim two.

### III.    Claim three:  improper opinion testimony

In his third claim, Tyre contends the State violated his Fourteenth Amendment right to a fair trial because the trial court admitted opinion testimony from Dr. Baxter, the State's expert witness, that "told the jury that he was guilty of the crimes charged."  Dkt. 1, at 36-37.

### A.    Clearly established federal law

The admission of evidence at a state trial is largely governed by state law.  And whether evidence was improperly admitted under state rules of evidence "is no part of a federal court's habeas review of a state conviction."  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also Lisenba v. California*, 314 U.S. 219, 228 (1941) (noting that federal habeas courts "do not sit to review state court action on questions of the propriety of the trial judge's action in the admission of evidence"); *Thornburg v. Mullin*, 422 F.3d 1113, 1124 (10th Cir. 2005) (noting that, on federal habeas review, the court's "concern is not whether state rules of evidence were violated" and the court instead "must confine [itself] to 'deciding whether a conviction violated the Constitution, laws, or treaties of the United States'" (quoting *McGuire*, 502 U.S. at  68)).  Habeas review of state evidentiary rulings is therefore strictly limited to determining whether the admission of the challenged evidence "so infused the trial with unfairness as to deny due process of law."  *Lisbena*, 314 U.S. at 228.  And, when the state court has already passed on the due process question, a habeas petitioner must show that the state court had no reasonable basis to reject the due process claim.  *Richter*, 562 U.S. at 98.

### B.    Additional facts

As discussed, the jury heard evidence at trial, including a recording of Tyre's statement to a law enforcement officer, establishing that Tyre grabbed and shook P.T., that P.T. had a seizure and vomited, that Tyre cleaned her up and left her napping in a crib for about two hours, and that

P.T. woke up from her nap screaming, experienced another seizure, vomited again, and became nonresponsive.  Dkt. 9 (State's Exs. 9, 10).  During his direct examination, Dr. Baxter discussed P.T.'s symptoms and injuries, discussed the circumstances of Tyre leaving P.T. in the crib for two hours after she had vomited and experienced a seizure, and, in response to questions from the prosecutor, told the jury that he had arrived at two medical diagnoses:  "child abuse, specifically abusive head trauma," and "medical neglect."  Dkt. 8-4, Tr. Trial vol. 3, at 109-17 [579-87].

On direct appeal, Tyre relied on state law to argue that the trial court improperly admitted Dr. Baxter's opinion testimony regarding his medical diagnoses because, under state law, "opinion testimony cannot tell the jury what result to reach."  Dkt. 7-2, at 17-18.  In his conclusion paragraph, Tyre also asked the OCCA to find that the admission of Dr. Baxter's opinion testimony violated his Fourteenth Amendment right to due process.  *Id.* at 18.  Because Tyre did not object at trial to Dr. Baxter's testimony, the OCCA reviewed his challenge to its admission by applying its plain-error test.  The OCCA rejected Tyre's claim, stating:

> Expert opinion is admissible when it (1) is based on sufficient facts or data; (2) is the product of reliable principles and methods; and (3) the witness has applied those principles and methods reliably to the facts of the case.  12 O.S. 2011, § 2702.  An expert may also testify to an opinion on the ultimate issue, but may not simply tell jurors what result to reach.  12 O.S. 2011, § 2704; *Day v. State*, 2013 OK CR 8, ¶ 11, 303 P.3d 295, 297.  There is no plain or obvious deviation from these legal principles in the testimony challenged here.

Dkt. 7-9, at 7-8.

## C.    Analysis and conclusion

Respondent argues Tyre's challenge to the admission of evidence alleges an error of state law that is not cognizable on habeas review.  Dkt. 7, at 27-30.  Respondent further argues, that if Tyre's challenge is construed as alleging a federal due process violation, the OCCA reasonably determined that the admission of evidence did not deprive Tyre of a fair trial.  *Id.* at 29-30.

The Court construes claim three as asserting the same state law and federal due process

claim that Tyre presented to the OCCA.  But, for three reasons, the Court concludes that Tyre is not entitled to federal habeas relief.  First, to the extent Tyre contends the OCCA misapplied state law when it found no error in the admission of Dr. Baxter's testimony, *see* Dkt. 1, at 36, the Court agrees with Respondent that Tyre alleges an error of state law that is not subject to federal habeas review, *see McGuire*, 502 U.S. at 67-68; *Thornburg*, 422 F.3d at 1124.  Second, to the extent Tyre argues the OCCA's decision is objectively unreasonable because the OCCA did not provide a detailed explanation of its reasoning, *see* Dkt. 1, at 37, the Court finds this argument unavailing for the same reasons explained in this Court's analysis of Tyre's second claim, *see supra*, section II.C.  Third, to the extent Tyre alleges the admission of Dr. Baxter's testimony violated his constitutional right to due process, *see* Dkt. 1, at 37, the OCCA effectively determined that Tyre was not deprived of due process when it rejected his claim on plain-error review.  *See Thornburg*, 422 F.3d at 1125 (noting that the OCCA's plain-error test is the functional equivalent of the federal due-process test and that when the OCCA reviews a claim for plain error, a federal court "must defer to its ruling unless it 'unreasonably appli[ed]' that test").  And Tyre has not presented any argument, much less a persuasive one, to show that the OCCA unreasonably applied the federal due-process test in rejecting his challenge to the admission of Dr. Baxter's opinion testimony.  For these reasons, the Court denies the Petition as to claim three.

### CONCLUSION

The Court concludes that Tyre has not shown that federal habeas relief is warranted as to any claims raised in the Petition.  The Court therefore denies the Petition as to all claims raised therein.  The Court further concludes that Tyre has not shown that reasonable jurists would debate this Court's assessment of his constitutional claims.  The Court therefore declines to issue a certificate of appealability.  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (discussing showings

necessary to obtain a certificate of appealability under 28 U.S.C. § 2253).

**IT IS THEREFORE ORDERED** that (1) the Clerk of Court shall note on the record the substitution of David Rogers in place of Scott Crow as party respondent; (2) the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus (Dkt. 1) is **denied**; (3) a certificate of appealability is **denied**; and (4) a separate judgment shall be entered in this matter.

**DATED** this 5th day of June, 2024.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE